IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE U.S. DEPARTMENT OF | ) | |
| COMMERCE; and its agencies the | ) | |
| NATIONAL OCEANIC AND | ) | |
| ATMOSPHERIC ADMINISTRATION | ) | Civil Action No.   _____ |
| and THE NATIONAL MARINE | ) | |
| FISHERIES SERVICE; and, in their | ) | |
| official capacities, THE SECRETARY | ) | |
| OF COMMERCE; ASSISTANT | ) | |
| SECRETARY OF COMMERCE FOR | ) | |
| ENVIRONMENTAL OBSERVATION | ) | |
| AND PREDICTION; NATIONAL | ) | |
| MARINE FISHERIES SERVICE | ) | |
| ASSISTANT ADMINISTRATOR FOR | ) | |
| FISHERIES; NATIONAL MARINE | ) | |
| FISHERIES SERVICE DEPUTY | ) | |
| ASSISTANT ADMINISTRATOR FOR | ) | |
| REGULATORY PROGRAMS;  and | ) | |
| NATIONAL MARINE FISHERIES | ) | |
| SERVICE REGIONAL | ) | |
| ADMINISTRATOR, SOUTHEAST | ) | |
| REGIONAL OFFICE, | ) | |
| | ) | |
| *Respondents.* | ) | |

**COMPLAINT AND PETITION FOR REVIEW**

## I. INTRODUCTION

1.   This lawsuit is about private recreational fishing of red snapper off the Texas Coast.  Since 2018, the federal government has allocated a certain annual catch limit ("ACL"), in pounds, of red snapper that can be caught by private anglers in the federal waters off Texas and landed on the Texas Coast.  The Texas Parks and Wildlife Department ("TPWD") manages this fishing under a federally-approved plan, and its data, reported to the National Marine Fisheries Service ("NMFS"), shows that Texas has stayed within its allocation.   NMFS never challenged Texas's data.   Yet on August 24, 2020, two-thirds of the way through the 2020 Texas fishing season, NMFS promulgated a rule determining—without explanation—that Texas is more than 100,000 pounds over its allocation.   Texas now challenges that Rule and asks this Court to declare it void, set it aside, and enjoin NMFS from applying the unexplained and unsupported overage to Texas's allocation in future seasons.

## II. NATURE OF ACTION

2.   Petitioner, the State of Texas, brings this civil action against the United States Department of Commerce and responsible agencies and officials within it, pursuant to the Administrative Procedure Act, 5 U.S.C. § 701-706 ("APA"), and the Magnuson-Stevens Fishery Conservation and

Management Act, 16 U.S.C. §§ 1801 *et seq*. ("Magnuson-Stevens Act" or "MSA").  Texas seeks review of an unlawfully promulgated "temporary" rule entitled "*Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; 2020 Red Snapper Private Angling Component Accountability Measure in Federal Waters Off Texas*," published at 85 Fed. Reg. 52,055 (Aug. 24, 2020) ("Rule" or "August Rule") (provided as Exhibit 1).

3.     The Rule reduces the amount of red snapper that private fishermen can catch off Texas.  As discussed more fully below, each Gulf State has an allocation, in pounds, setting the amount of red snapper that can be taken annually.  The Rule asserts that Texas has exceeded its 2019 allocation by more than 100,000 pounds, reduces Texas's allocation for 2020 by that amount, and threatens reduction for the 2021 season.  The Rule is unlawful in several ways.

4.     The Rule violates the Magnuson-Stevens Act and the national standards set in the Act, as well as the Act's policy of cooperative federalism.  The Rule violates the APA because, in addition to being unlawful under the Magnuson-Stevens Act, it is arbitrary, capricious, and an abuse of the Respondents' discretion.  The Rule rests on the claim that Respondent, the National Marine Fisheries Service ("NMFS"), has determined that Texas is

110,526 pounds over its allocation, but the Rule never explains how NMFS reached that number.

5.      Texas tracks its red snapper landings and reports them to NMFS. Texas's data shows landings well within its allocation.  NMFS does not explain how it reached a number so different from those collecting the data. The Rule also states that it is based on "the best scientific information available" but fails to identify NMFS's method for reaching its overage number.  In fact, the Rule does not even explain how or why the NMFS numbers are better than Texas's, much less how NMFS's information is the best available. Texas's methodology for estimating landings of red snapper was provided to NMFS as part of Texas's Exempt Fishing Permit ("EFP") for 2018 and 2019 (provided as Exhibit 2).  Texas has used its methodology to report red snapper landings to NMFS since 2018 and was not questioned by NMFS for more than two and a half years until now, two-thirds of the way through the 2020 Texas red snapper fishing season.  This abrupt and unilateral change in course, its immediate application to numbers from this year and the two past seasons, and its draconian effect on the 2021 season is arbitrary, capricious, and an abuse of NMFS's discretion.

6.      Further, the Rule was promulgated without notice and comment rulemaking in violation of the APA, 5 U.S.C. § 553(b)(B), the MSA, 16 U.S.C.

§ 1855(d), and  NMFS own policy directive that notice and comment rulemaking is required in all but rare, special, urgent circumstances. Respondents' statement of "good cause" for dispensing with notice and comment rulemaking is disingenuous.  And although titled as a "Temporary" Rule expiring at the end of 2020, the Rule has effects far beyond that date that could curtail or prevent private fishermen from catching red snapper off Texas.  The methodology by which NMFS's calculation of red snapper landings result in a dramatically different number from Texas's should have been identified in a proposed rule and have been subject to comment.

7.    Texas seeks declaratory relief setting the Rule aside and injunctive relief preventing NMFS from further reducing Texas's red snapper allocation.  In lieu of preliminary injunctive relief, the Magnuson-Stevens Act authorizes expedited treatment of challenges to agency action.  Because of the far-reaching effect of the Rule, this lawsuit will not become moot at the end of 2020, but expedited treatment is still appropriate.  Texas will work with Respondents toward as fast-track a schedule as possible in the hope of avoiding the need for a formal Motion to Expedite.

### III. PARTIES

8.      Petitioner is the State of Texas.  The Attorney General of Texas brings this suit at the request of the Texas Parks and Wildlife Department ("TPWD") to assert the rights of Texas and its citizens.

9.      Respondents are the United States Department of Commerce ("Commerce"), a department of the executive branch of the United States government, the National Oceanic and Atmospheric Administration ("NOAA"), an agency within Commerce, and NMFS, a federal agency that is a division of NOAA.  Respondents additionally include the acting United States Secretary of Commerce ("Secretary"); the Assistant Secretary of Commerce for Environmental Observation and Prediction, performing the duties of Under Secretary of Commerce for Oceans and Atmosphere; NMFS Assistant Administrator for Fisheries; NMFS Deputy Assistant Administrator for Regulatory Programs; and NMFS Regional Administrator, Southeast Regional Office, are sued in their official capacities.

### IV. JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction pursuant to both 16 U.S.C. § 1861(d) and 28 U.S.C. § 1331 (federal question).  The Rule was promulgated by NMFS under the Magnuson-Stevens Act.  Pursuant to § 1855(f) of that Act and APA §§ 701 – 706, Texas is expressly permitted to

seek direct and immediate judicial review of the Rule within thirty (30) days of the date it was published in the Federal Register.  Section 1861(d) of the Magnuson-Stevens Act provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under the provisions of this chapter." Additionally, for the same reasons, this action is also one arising under the laws of the United States for purposes of federal-question jurisdiction under 28 U.S.C. § 1331.

11.   Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because (1) Respondents are either (a) agencies or instrumentalities of the United States or (b) officers or employees of the United States acting in their official capacities; (2)  Texas is a resident of the Southern District of Texas;[1] and (3) no real property is involved in this action.  Venue is also proper under § 1391(e)(1)(B) because NMFS and the Gulf of Mexico Fishery Management Council ("Gulf Council") convene periodic meetings in this district to plan the regulation of red snapper, the red snapper catch at issue in this case is landed on the Texas Coast lying within this district; and it is anticipated that a substantial part of the impact of the Rule will be felt in this district. Therefore, "a substantial part of the events or omissions giving rise to the claim" occurred in this district for purposes of § 1391(e)(1)(B).

---

[1] *See Delaware v. Bender*, 370 F.Supp. 1193, 1200 (D. Del. 1974).

## V. PETITIONER'S STANDING

12.    Texas, like all other coastal states, has an historical, independent interest in the quality and condition of its coastal waters, including an ownership interest in the tide-waters within its jurisdiction and the fish in them.  TPWD is the state agency with primary responsibility for protecting Texas's fish and wildlife resources.[2]  Furthermore, the Magnuson-Stevens Act expressly authorizes states to regulate fishing in their own state waters and to participate in the regulation of the fishing season within the adjacent federal waters.  Texas has standing to sue on behalf of its residents and their natural resources, including red snapper.  *Cf. State of Louisiana v. Baldridge* 538 F. Supp. 625, 628-29 (E.D. La. 1982).

## VI. STATUTORY BACKGROUND

13.    The Magnuson-Stevens Act recognizes that the fish off the states' coasts are valuable, renewable resources that—properly managed—can provide continuing yields for commercial and recreational fishermen.  16 U.S.C. §§ 1801(a)(1),(3),(5),(6).  The Act creates that management program, which operates through NOAA, a federal agency, NOAA's subdivision NMFS, and Regional Fishery Management Councils consisting of representatives from every coastal state.  *Id.* § 1852.

---

[2] Tex. Parks & Wild. Code § 12.0011(a).

### A.    The Council system

14.    Put simply, stewardship of this valuable resource is the Council system's purpose.  *Id*. § 1801(b)(5).  The Councils are charged with preparing, monitoring, and revising fishery management plans (FMPs) under circumstances that (1) enable interested groups "to participate in, and advise on, the establishment and administration of such plans" and (2) "take into account the social and economic needs of the States."  *Id*. § 1801(b)(5).  The Gulf Council consists of voting members from Texas, Louisiana, Mississippi, Alabama, and Florida.  *Id*. § 1852(a)(1)(E).  With the exception of what are known as "highly migratory species," over which the Secretary of Commerce has authority,[3] the Gulf Council has authority over the fisheries (fish stocks that can be managed as a unit) in the Gulf of Mexico seaward of those states.  *Id*. §§ 1802(13), 1852(a)(1)(E),(3).  There are two types of Gulf waters seaward of the states:  the individual states' territorial seas and the Exclusive Economic Zone (EEZ).  In Texas, the territorial sea extends nine nautical miles[4] from the shoreline,[5] and the EEZ extends from there out to 200

---

[3] Red snapper is not a "highly migratory species."  *See* 16 U.S.C. § 1802(21).

[4] A nautical mile (sometimes abbreviated "nm") is about 1.15 statutory miles.  A marine league is 3 nm.

[5] "Shoreline" can mean different things in different contexts.  For purposes of maritime zones, NOAA defines it as equivalent to a construct known as the "baseline," which often, but not always, is equivalent to the mean low water line.  *See* the definition of "baseline" and "coast line" at *Glossary*, NOAA Shoreline Website, A Guide to National Shoreline Data and Terms, http://shoreline.noaa.gov/glossary.html#partr *(last visited April 15, 2013)*.

nautical miles.[6]  The states have jurisdiction over their own waters, and the Council has authority over the EEZ.  16 U.S.C. § 1856.

15.    The Magnuson-Stevens Act contemplates that the Council system will operate under cooperative federalism.   With one limited exception, nothing in the Act "shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries."   *Id.* § 1856(a)(1).   A state's boundaries extend to the limits of its historical territorial sea.   *Id.* § 1856(a)(2).[7] The Secretary may step in and regulate within a state's territorial sea only:

(1)    [i]f the Secretary finds, *after notice and an opportunity for a hearing* in accordance with section 554 of Title 5, that–

(A) the fishing in a fishery, which is covered by a fishery management plan implemented under this chapter, is engaged in predominately within the exclusive economic zone and beyond such zone; and

(B) any State has taken any action, or omitted to take any action, the results of which will substantially and adversely affect the carrying out of such fishery management plan[.]

---

[6] *See* 16 U.S.C. § 1802(11); Presidential Proclamation 5030, 48 Fed. Reg. 10606 (Mar. 10, 1983).   The Submerged Lands Act of 1953, 43 U.S.C. §§ 1301-1315, extended state jurisdiction to ocean waters and submerged lands to 3 nm, and farther for Gulf coast states if a longer boundary existed at the time the state was admitted to the union and that boundary had been approved by Congress.   Pursuant to this, Texas's and Florida's territorial seas extend 9 nm (3 marine leagues) into the Gulf.   *See United States v. Louisiana*, 363 U.S. 1, 65 (1960).

[7] In 1988, President Reagan extended the beginning of the U.S. territorial sea from 3 nm to 12 nm, but the United States contends that this did not extend state jurisdiction to the new 12 nm line.   *See* Proclamation No. 5928, 3 C.F.R. 547 (1988).   To the extent that Texas disagrees, that disagreement is not part of, and has no bearing on, this dispute.

*Id*. § 1856(b)(emphasis added).

## B.      The Councils' preparation of fishery management plans

16.      The ten national standards set out in 16 U.S.C. § 1851(a)(1)-(10)

are the lodestar of any fishery management plan.

• National Standard 2 provides that "[c]onservation and management measures shall be based upon the best scientific information available."[8]

• National Standard 4 provides, in part, that "[c]onservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.[9]

• National Standard 5 provides that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no measure shall have economic allocation as its sole purpose."[10]

• National Standard 6 provides that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."[11]

• National Standard 8 provides that "[c]onservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained

---

[8] 16 U.S.C. § 1851(a)(2).

[9] *Id*. § 1851(a)(4).

[10] *Id*. § 1851(a)(5).

[11] *Id*. § 1851(a)(6).

participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."[12]

17.     NMFS has published policy guidelines based on these national standards to assist in the development and review of FMPs, amendments, and regulations prepared by the Secretary and the Councils.  *See* 50 CFR § 600.305 *et seq*.  FMPs, and amendments to them, are promulgated as regulations.  Councils submit their FMPs and FMP amendments to the Secretary of Commerce, who acts through NMFS.  NMFS in turn undergoes rulemaking, soliciting public comment and reviewing the FMPs to ensure they are consistent with the national standards and other applicable laws.  16 § 1853(a)(1)(C).  NMFS must approve an FMP or FMP amendment if it is consistent with applicable law and disapprove it if not.  *Id*. § 1854(a)(3). NMFS must promulgate final regulations within 30 days of the end of the comment period.  *Id*. § 1854(b)(3).

18.     All regulations go through this conventional notice-and-comment rulemaking process with only one, narrow exception.   The Magnuson-Stevens Act allows the Secretary to promulgate emergency regulations that take effect immediately upon publication, bypassing the requirement of prior notice and comment, when either the Secretary or a

---

[12] *Id*. § 1851(a)(8).

Council finds that an emergency exists. *Id.* § 1855(c)(1),(2). When a Council vote is unanimous, the statute provides that the Secretary "shall" promulgate an emergency regulation; when the vote is not unanimous, the Secretary "may" promulgate them. *Id.* § 1855 (c)(2)(A),(B).

19.    Of course, the Secretary does not have the absolute, unfettered discretion to declare that an emergency exists, regardless of circumstances. Otherwise, what was obviously intended to be a limited, narrow exception could swallow the rule, rendering the notice-and-comment rulemaking provisions of the Act nugatory. Accordingly, since 1997, NMFS and NOAA have had policy guidelines to use to determine whether an emergency regulation is justified under the authority of the Act. *Policy Guidelines for the Use of Emergency Rules*, 62 Fed. Reg. 44421 (Aug. 21, 1997). The Policy Guidelines were finalized into a formal NMFS directive in 2008 and renewed in 2018. (provided as Exhibit 3). The directive sets out criteria to use in determining whether an emergency exists. An emergency, for the purpose of 16 U.S.C. § 1855(c),

(1)    [r]esults from recent, unforeseen events or recently discovered circumstances; and

(2)    presents serious conservation or management problems in the fishery; and

(3)    can be addressed through emergency regulations for which the immediate benefits outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on

13

participants to the same extent as would be expected under normal rulemaking process.

*See* Exhibit 3.

20.    The policy statement accompanying the criteria declares that the only legal prerequisite for the use of the Secretary's emergency authority is the existence of an emergency, and that the exercise of this authority should be "limited to extremely urgent, special circumstances where substantial harm to or disruption of the resource, fishery, or community would be caused in the time it would take to follow standard rulemaking procedures. An emergency action may not be based on administrative inaction to solve a long-recognized problem." *Id.* The policy specifically notes a preference for traditional rulemaking: "[c]ontroversial actions with serious economic effects, except under extraordinary circumstances, should be done through normal notice-and-comment rulemaking." *Id.*

### C.    Judicial Review

21.    The Magnuson-Stevens Act authorizes judicial review of regulations promulgated under it. 16 U.S.C. § 1855(f). Review is conducted in accordance with the APA, but the Act prohibits relief postponing the regulation's effective date or preserving the status quo during the pendency of review. *Id.* § 1855(f)(1)(A).

14

22.    The Act also provides for expedited review of regulations, including emergency regulations "[u]pon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way." *Id*. § 1855(f)(4).

23.    The Magnuson-Stevens Act makes the APA's scope of review provision applicable and specifies that courts should set regulations aside if they are:

(A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)    contrary to constitutional right, power, privilege, or immunity;

(C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D)    without observance of procedure required by law;

16 U.S.C. § 1855(f)(1)(B) (referencing 5 U.S.C.A. § 706(A)–(D)).

## VII.  FACTUAL BACKGROUND OF THIS DISPUTE

24.    Private recreational fishing for red snapper in both state and federal waters is now managed by each Gulf state under plans approved by the Council and NMFS.  In 2018 and 2019, Texas operated under an Exempt Fishing Permit ("EFP").

25.    Operating under an EFP in 2018 and 2019, TPWD had the authority to manage the red snapper fishery in federal waters for private recreational anglers.  TPWD established the opening and closing of the red snapper season in federal waters for private recreational angling and also set the length of the season in days.  Length of season is based on projected landings throughout the season to comply with allowable catch limits in pounds.  TPWD closes the federal waters season once the allocation is near 70% to allow for state waters to remain open year-round to land the remainder of the allowable catch limit.  As required as a condition of the EFP, TPWD provided NMFS with the estimated number of anglers, estimated number of trips, estimated number of red snapper, and estimated cumulative pounds and percent of allocation harvested.  This information is submitted for the period of January 1 through May 31.  Once the federal waters season opens on June 1, the same information is provided every two weeks (bi-monthly) for the remainder of the calendar year.  A total of 16 and 17 reports were submitted to NMFS for 2018 and 2019, respectively.

26.    In 2020, NMFS promulgated a rule (colloquially known as Amendment 50f for Texas) authorizing state management and allocating Texas 265,105 pounds for private red snapper fishing.  85 Fed. Reg. 6819 (Feb. 6,2020), codified at 50 C.F.R. 622.23.  ("February Rule") (provided as

Exhibit 4)  If a state exceeds its allocation, NMFS may post notice in the Federal Register at or near the beginning of the following fishing year[13] that assesses a payback penalty in the amount of the overage from the prior year, thereby reducing the allocation for the fishing year just starting.  50 C.F.R. 622.23(b) ("payback").

27.    In 2018, 2019, and 2020, Texas diligently reported its landings estimates from the period of January 1 to May 31 before the federal season opened.  For each year, TPWD also provided cumulative bi-monthly landings estimates after June 1, the opening date of the federal waters season.  NMFS never challenged the data, the methodology by which Texas counts, or the assessment of how much of the Texas allocation was remaining. Yet, suddenly in late July 2020, NMFS claimed that Texas was over its 2019 allocation and in August, promulgated the August Rule docking Texas by 110,526 pounds of red snapper.

---

[13] 50 CFR § 622.7 defines the fishing year as January 1 to December 31.

### VIII. Claim for Relief:  The Rule is unlawful and should be declared invalid and void and set aside.

### A.   The Rule is unlawful because it violates National Standard 2 (best science) of the Magnuson-Stevens Act.

28.   The Rule rests on the claim that Respondent NMFS has determined that Texas is 110,526 pounds over its allocation, but the Rule never explains how NMFS reached that number.  Texas tracks its red snapper landings and reports them to NMFS.  Texas's data shows landings well within its allocation. NMFS does not explain how it reached a number so different from those collecting the data.

29.   The Rule also states that it is based on the best scientific information available but fails to identify NMFS's method for reaching its overage number.  In fact, the Rule does not even explain how or why the NMFS numbers are better than Texas's, much less how NMFS's information is the best available.

### B.   By improperly applying 50 C.F.R. § 622.23(b) and missing the deadline set by that regulation, NMFS has acted unlawfully.  And by retroactively applying an "overage" without foundation to the 2019 and 2020 fishing seasons NMFS has acted arbitrarily and capriciously, with a draconian effect on the 2021 season.

30.   The August Rule applies the payback provision of 50 C.F.R. § 622.23(b), but that regulation was not promulgated until February 2020. 85 Fed. Reg. 6819 (Feb. 6, 2020).  In 2018 and 2019, Texas managed private

18

red snapper fishing under its Exempt Fishing Permits.  The 2019 EFP provides that if the recreational quota is exceeded in 2019, TPWD will adjust the quota for the following year to account for the overage in 2019 should the EFP be extended for an additional year.  No EFP was extended for 2020, and TPWD instead operated under Amendment 50f for Texas for the 2020 season.  Applying a new regulation to past circumstances, when the matter is as substantive as this one is, is impermissibly retroactive.

31.   And even if the payback provision of 50 C.F.R. § 622.23(b) did apply to Texas's 2019 catch, NMFS has violated the provision's terms.  Any notification of a state exceeding its allocation in one fishing year and therefore facing reduction in its next fishing year must be placed in the Federal Register "at or near the beginning of the following fishing year." Texas's 2020 fishing year started on January 1; NMFS's notification did not occur until the August 24, 2020 Rule.

32.   NMFS accepted the Texas methodology for estimating red snapper landings for more than two years without any indication that NMFS believed that the Texas methodology was inaccurate or not based upon the best available science.  It is arbitrary and capricious for NMFS to wait until two-thirds of the way through the 2020 fishing year to change methodologies for calculating red snapper landings for the 2019 fishing year and thereby

apply a payback provision for an alleged overage of the 2019 Texas red snapper allocation to 2020 Texas red snapper allocation via a temporary or emergency rule.  This is particularly egregious because the August Rule overtly threatens Texas's 2021 season: "failure to implement the ACL overage adjustment [payback] may result an overage of the Texas ACL in 2020 and less access to red snapper off the coast of Texas in 2021."

33.    Even if the federal methodology for calculating red snapper is found to be the best available science, this methodology should not be applied retroactively to calculate landings for the 2019 fishing year.

34.    This abrupt and unilateral change in course, its immediate application to numbers from this year and the two past seasons, and its draconian effect on the 2021 season is arbitrary, capricious, and an abuse of NMFS's discretion.

**C.   The Rule is unlawful because it was promulgated without notice and comment rulemaking in violation of the APA, 5 U.S.C. § 553(b)(B), and the Magnuson-Stevens Act, 16 U.S.C. § 1855.**

35.    The central tenet of agency rulemaking is that rules cannot be promulgated without the agency providing notice in the Federal Register and an opportunity for the public to present comment, which the agency must consider.  5 U.S.C. § 553(b), (c).  An agency can avoid this process only it if determines that notice and comment is impracticable, unnecessary, or

20

contrary to the public interest and places in the rule itself a "good cause" finding and states the reasons for that finding. *Id.*

36.   Here, NMFS claims "good cause" exists because normal notice and comment are (1) unnecessary because the rule authorizing post-season adjustment of the ACL already went through notice and comment rulemaking and (2) contrary to the public interest because "failure to implement the ACL overage adjustment immediately may result an overage of the Texas ACL in 2020 and less access to red snapper off the coast of Texas in 2021." 85 Fed. Reg.  52,056 (Aug. 24, 2020).

37.   Neither reason demonstrates good cause.  NMFS cannot rely on the earlier notice and comment rulemaking that was codified at 50 C.F.R. § 622.23(b) to justify dispensing with notice and comment for this rule assessing an overage—and payback penalty—for the landings occurring during the 2019 season.  As noted above, the payback penalty does not apply to the 2019 season.  That season is governed by the 2019 Exempt Fishing Permit, which does not have a payback feature.  The payback feature did not come into play until the rule now at 50 C.F.R. § 622.23(b) was promulgated in February 2020.

38.   Even if it applied to the 2019 season landings, § 622.23(b) does not authorize NMFS to use a system (whatever it is) that produces a number

wildly different from Texas's.  In fact, in response to a public comment during the February 2020 rulemaking that led to § 622.23(b), NMFS expressly stated that "NMFS agrees that the state ACLs should be calibrated to each state's reporting system."  85 Fed. Reg. 6822 (Feb. 6, 2020).  But in the August 2020 rule, NMFS ignored its own statement and compounded its error by closing off public comment, keeping Texas from having an opportunity to state its position and receive an on-the-record response.

39.    As to notice and comment being contrary to the public interest, NMFS's justification is nothing more than a circular, self-proclaimed crisis. As NMFS sees it, its unexplained newly discovered overage is going to be a problem for red snapper fishing off Texas, so Texas should be cut off from commenting.

40.    This is contrary to the Magnuson-Stevens Act, which expressly obligates the Secretary of Commerce to follow the general federal rulemaking statute.  16 U.S.C. § 1855(d).  In addition, the Act authorizes the Secretary to promulgate emergency or interim measures.  16 U.S.C. § 1855(c).  NMFS has developed a policy directive that emergency rules should be used sparingly, reserved for the most urgent circumstances.  *See Policy Guidance for the Use*

*of Emergency Rules*, 62 Fed. Reg. 44,421 (Aug. 21, 1997)[14]  Such rules must involve recent,  unforeseen, or newly discovered circumstances that present a serious conservation or management problem that can be addressed through an emergency regulation whose benefits outweigh "the value of advance notice, public comment, and deliberative consideration of the impacts on participants to the same extent as would be expected under the normal rulemaking process." *Id.* at 3. Rules that do not meet these criteria are void. *See Texas v. Crabtree*, 948 F.Supp.2d 676, 690 (S.D. Tex., 2013).

41.    There is nothing unforeseen about the situation in this case.  For more than two and half years, NMFS has received Texas's data and estimation of its compliance with its allocation without a word of dissent. Suddenly, long after the deadline for a post-2019 season adjustment and two-thirds of the way into the 2020 season in which a genuine adjustment might be made, NMFS proclaims an unexplained overage and demands payback.

42.    And finally, it should be noted that NMFS did not even bother to claim much less explain why there was "good cause" to make the rule effective immediately.

---

[14] This policy guideline was reaffirmed and converted to a NMFS directive on Mar 31, 2008 and again in 2018.  *See* http//www.nmfs.noaa.gov/op/pds/documents/01/101/01-101-07.pdf (last visited September 20, 2020).

## IX.  PRAYER FOR RELIEF

Pursuant to 16 U.S.C. § 1855(f) and 5 U.S.C. §§ 701-706, Petitioners, the State of Texas, respectfully request that the Court hold void, unlawful, and set aside, pursuant to APA § 706(2)(A), (C), and/or (D), the Temporary Rule entitled *Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; 2020 Red Snapper Private Angling Component Accountability Measure in Federal Waters Off Texas,*" published at 85 Fed. Reg. 52,055 (Aug. 24, 2020).

To the extent necessary and appropriate, Petitioners also request (1) a declaration under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that the Temporary Rule was improperly promulgated, and is therefore void and of no force and effect; and (2) a permanent injunction prohibiting Respondents from enforcing or otherwise acting pursuant to or in accordance with the Temporary Rule.  Additionally, Petitioners request that they be awarded their costs of suit, and that they have all other relief to which they are entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

*/s/ Linda B. Secord*
LINDA B. SECORD
Attorney-in-Charge
Assistant Attorney General
Texas Bar No. 17973400
Linda.Secord@oag.texas.gov

KELLIE E. BILLINGS-RAY
Deputy Division Chief
Texas Bar No. 24042447
Kellie.Billings-Ray@oag.texas.gov
*application for admission pending*

Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, (MC-066)
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

COUNSEL FOR THE
TEXAS PARKS AND WILDLIFE
DEPARTMENT