Department of Commerce · National Oceanic & Atmospheric Administration · National Marine Fisheries Service

| |
|---|
| ***NATIONAL MARINE FISHERIES SERVICE PROCEDURE 01-101-07*** <br> Effective on: August 21, 1997 |
| To be reviewed on: October 1, 2023 |
| Fisheries Management <br> Fishery Management Actions, 01-101 |
| Policy Guidelines for the Use of Emergency Rules |

**NOTICE:** This publication is available at: https://www.fisheries.noaa.gov/national/laws-and-policies/policy-directive-system

| | |
|---|---|
| **Author name:** Kelly Denit <br> **Office:** Sustainable Fisheries | **Certified by:** Alan Risenhoover <br> **Office:** Sustainable Fisheries |

**Type of Issuance:** Renewal, October 2018

---

***SUMMARY OF REVISIONS:***

Renewed in October 2018. This initial directive was put into effect on August 21, 1997.

Signed _____

Digitally signed by
RISENHOOVER.ALAN.D.1365879490
Date: 2018.10.03 17:54:38 -04'00'

Alan Risenhoover                                        Date
Director, Office of Sustainable Fisheries

I.   Introduction

This procedure describes guidelines for the Regional Fishery Management Councils (Councils) in determining whether the use of an emergency rule is justified under the authority of the Magnuson-Stevens Fishery Conservation and Management Act. It also provides NMFS Regional Administrators guidance in the development and approval of regulations to address events or problems that require immediate action.

II.  Objective

These guidelines ensure that Councils and the Secretary of Commerce are fulfilling the intent of Congress that emergency rules be used only to address conservation, biological, economic, social, and health emergencies.

III. Guidance

The preparation or approval of management actions under the emergency provisions of section 305 (c) of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) should be limited to extremely urgent, special circumstances

Exhibit 3

where substantial harm to or disruption of the resource, fishery, or community would be caused in the time it would take to follow standard rulemaking procedures. An emergency action may not be based on Administrative inaction to solve a long-recognized problem. In order to approve an emergency rule, the Secretary of Commerce (Secretary) must have an administrative record justifying emergency regulatory action and demonstrating its compliance with the national standards. The only legal prerequisite for the use of the Secretary's emergency authority is that an emergency must exist. Congress intended that emergency authority be available to address conservation, biological, economic, social, and health emergencies. In addition, emergency regulations may make direct allocations among user groups, if strong justification and administrative record demonstrates that, absent emergency regulation, substantial harm will occur to one or more segments of the fishing industry. Controversial actions with serious economic effects, except under extraordinary circumstances, should be done through normal notice-and-comment rulemaking.

The process of implementing emergency regulations limits the public participation in rulemaking that Congress intended under the Magnuson-Stevens Act and the Administrative procedures act. The Councils and Secretary must, whenever possible, afford the full scope of public participation in rulemaking. In addition, an emergency rule may delay the review of non-emergency rules, because the emergency rules take precedence. Emergency actions should not be routine events.

### Rationale for Emergency Action

1. The Secretary may promulgate emergency regulations to address an emergency if the Secretary finds that an emergency or overfishing exists, without regard to whether a fishery management plan exists for that fishery;

2. The Secretary shall promulgate emergency regulations to address the emergency or overfishing if the Council, by a unanimous vote of the voting members, requests the Secretary to take such action[1];

3. The Secretary may promulgate emergency regulations to address the emergency or overfishing if the Council, by less than a unanimous vote of its voting members, requests the Secretary to take such action; and

4. The Secretary may promulgate emergency regulations that respond to a public health emergency or an oil spill. Such emergency regulations may remain in effect until the circumstance that created the emergency no longer exist, provided that the public has had an opportunity to comment on the regulation after it has been published, and in the case of a public health emergency, the Secretary of Health and Human Services concurs with the Secretary's action.

### Emergency Criteria

The phrase "an emergency exists involving any fishery" is defined as a situation that:

1. Results from recent, unforeseen events or recently discovered circumstances; and

---

[1] The NOAA Office of General Counsel has defined the phrase "unanimous vote," to mean the unanimous vote of a quorum voting members of the Council only. An abstention has no effect on the unanimity of the quorum vote.

Exhibit 3

2.  Presents serious conservation or management problems in the fishery; and

3.  Can be addressed through emergency regulations for which the immediate benefits outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on participants to the same extent as would be expected under the normal rulemaking process.

**Emergency Justification**

If the time it would take to complete notice-and-comment rulemaking or complete a fishery management plan or amendment would result in substantial damage or loss to a living marine resource, habitat, fishery, industry participants or communities, or substantial adverse impacts to the public health, emergency action might be justified under one or more of the following situations:

1.  Ecological- (A)to prevent overfishing as defined in a Fishery Management Plan (FMP), or as defined by the Secretary in the absence of an FMP, or (B) to prevent other serious damage to the fishery resource or habitat; or

2.  Economic- to prevent significant direct economic loss or preserve a significant economic opportunity that otherwise might be foregone; or

3.  Social- to prevent significant community impacts or conflict between user groups; or

4.  Public Health- to prevent significant adverse effects to health of participants in a fishery or to the consumers of seafood products.

3

Exhibit 3

NMFS Procedure 01-101-07, August 21, 1997

# Attachment 1

*Policy - Emergency Rules*

**Federal Register** / Vol. 62, No. 162 / Thursday, August 21, 1997 / Rules and Regulations **44421**

THEFT RATES OF MODEL YEAR 1995 PASSENGER MOTOR VEHICLES STOLEN IN CALENDAR YEAR 1995—Continued

| Manufacturer | Make/model (line) | Thefts 1995 | Production (mfgr's) 1995 | 1995 (per 1,000 vehicles produced) theft rate |
|---|---|---|---|---|
| 205  ROLLS-ROYCE | SIL SPIRIT/SPUR/MULS | 0 | 132 | 0.0000 |
| 206  ROLLS-ROYCE | TURBO R | 0 | 19 | 0.0000 |
| 207  VOLKSWAGEN | EUROVAN | 0 | 1,814 | 0.0000 |
| 208  VOLVO | LIMOUSINE | 0 | 6 | 0.0000 |

Issued on: August 18, 1997.

L. Robert Shelton,
*Associate Administrator for Safety Performance Standards.*
[FR Doc. 97–22263 Filed 8–20–97; 8:45 am]
BILLING CODE 4910-59-P

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Chapter VI**

[Docket No. 970728184–7184–01; I.D. 060997C]

**Policy Guidelines for the Use of Emergency Rules**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Policy guidelines for the use of emergency rules.

**SUMMARY:** NMFS is issuing revised guidelines for the Regional Fishery Management Councils (Councils) in determining whether the use of an emergency rule is justified under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). The guidelines were also developed to provide the NMFS Regional Administrators guidance in the development and approval of regulations to address events or problems that require immediate action. These revisions make the guidelines consistent with the requirements of section 305(c) of the Magnuson-Stevens Act, as amended by the Sustainable Fisheries Act.

**DATES:** Effective August 21, 1997.

**FOR FURTHER INFORMATION CONTACT:** Paula N. Evans, NMFS, 301/713–2341.

**SUPPLEMENTARY INFORMATION:**

**Background**

On February 5, 1992, NMFS issued policy guidelines for the use of emergency rules that were published in the Federal Register on January 6, 1992 (57 FR 375). These guidelines were consistent with the requirements of section 305(c) of the Magnuson Fishery Conservation and Management Act. On October 11, 1996, President Clinton signed into law the Sustainable Fisheries Act (Public Law 104–297), which made numerous amendments to the Magnuson-Stevens Act. The amendments significantly changed the process under which fishery management plans (FMPs), FMP amendments, and most regulations are reviewed and implemented. Because of these changes, NMFS is revising the policy guidelines for the preparation and approval of emergency regulations. Another change to section 305(c), concerning interim measures to reduce overfishing, will be addressed in revisions to the national standards guidelines.

**Rationale for Emergency Action**

Section 305(c) of the Magnuson-Stevens Act provides for taking emergency action with regard to any fishery, but does not define the circumstances that would justify such emergency action. Section 305(c) provides that:

1. The Secretary of Commerce (Secretary) may promulgate emergency regulations to address an emergency if the Secretary finds that an emergency exists, without regard to whether a fishery management plan exists for that fishery;

2. The Secretary shall promulgate emergency regulations to address the emergency if the Council, by a unanimous vote of the voting members, requests the Secretary to take such action;

3. The Secretary may promulgate emergency regulations to address the emergency if the Council, by less than a unanimous vote of its voting members, requests the Secretary to take such action; and

4. The Secretary may promulgate emergency regulations that respond to a public health emergency or an oil spill. Such emergency regulations may remain in effect until the circumstances that created the emergency no longer exist, provided that the public has had an opportunity to comment on the regulation after it has been published, and in the case of a public health emergency, the Secretary of Health and Human Services concurs with the Secretary's action.

**Policy**

The NOAA Office of General Counsel has defined the phrase "unanimous vote," in paragraphs 2 and 3 above, to mean the unanimous vote of a quorum of the voting members of the Council only. An abstention has no effect on the unanimity of the quorum vote. The only legal prerequisite for use of the Secretary's emergency authority is that an emergency must exist. Congress intended that emergency authority be available to address conservation, biological, economic, social, and health emergencies. In addition, emergency regulations may make direct allocations among user groups, if strong justification and the administrative record demonstrate that, absent emergency regulations, substantial harm will occur to one or more segments of the fishing industry. Controversial actions with serious economic effects, except under extraordinary circumstances, should be done through normal notice-and-comment rulemaking.

The preparation or approval of management actions under the emergency provisions of section 305(c) of the Magnuson-Stevens Act should be limited to extremely urgent, special circumstances where substantial harm to or disruption of the resource, fishery, or community would be caused in the time it would take to follow standard rulemaking procedures. An emergency action may not be based on administrative inaction to solve a long-recognized problem. In order to approve an emergency rule, the Secretary must have an administrative record justifying emergency regulatory action and demonstrating its compliance with the national standards. In addition, the preamble to the emergency rule should indicate what measures could be taken

4

Exhibit 3

or what alternative measures will be considered to effect a permanent solution to the problem addressed by the emergency rule.

The process of implementing emergency regulations limits substantially the public participation in rulemaking that Congress intended under the Magnuson-Stevens Act and the Administrative Procedure Act. The Councils and the Secretary must, whenever possible, afford the full scope of public participation in rulemaking. In addition, an emergency rule may delay the review of non-emergency rules, because the emergency rule takes precedence. Clearly, an emergency action should not be a routine event.

**Guidelines**

NMFS provides the following guidelines for the Councils to use in determining whether an emergency exists:

**Emergency Criteria**

For the purpose of section 305(c) of the Magnuson-Stevens Act, the phrase "an emergency exists involving any fishery" is defined as a situation that:

(1) Results from recent, unforeseen events or recently discovered circumstances; and

(2) Presents serious conservation or management problems in the fishery; and

(3) Can be addressed through emergency regulations for which the immediate benefits outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on participants to the same extent as would be expected under the normal rulemaking process.

**Emergency Justification**

If the time it would take to complete notice-and-comment rulemaking would result in substantial damage or loss to a living marine resource, habitat, fishery, industry participants or communities, or substantial adverse effect to the public health, emergency action might be justified under one or more of the following situations:

(1) Ecological—(A) to prevent overfishing as defined in an FMP, or as defined by the Secretary in the absence of an FMP, or (B) to prevent other serious damage to the fishery resource or habitat; or

(2) Economic—to prevent significant direct economic loss or to preserve a significant economic opportunity that otherwise might be foregone; or

(3) Social—to prevent significant community impacts or conflict between user groups; or

(4) Public health—to prevent significant adverse effects to health of participants in a fishery or to the consumers of seafood products.

Dated: August 14, 1997.

Gary C. Matlock,
*Acting Assistant Administrator for Fisheries, National Marine Fisheries Service.*

[FR Doc. 97–22094 Filed 8–20–97; 8:45 am]

BILLING CODE 3510-22-F

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Part 285**

[Docket No. 970702161–7197–02; I.D. 041097C]

RIN 0648–AJ93

**Atlantic Highly Migratory Species Fisheries; Import Restrictions**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS amends the regulations governing the Atlantic highly migratory species fisheries to prohibit importation of Atlantic bluefin tuna (ABT) and its products in any form harvested by vessels of Panama, Honduras, and Belize. The amendments are necessary to implement International Commission for the Conservation of Atlantic Tunas (ICCAT) recommendations designed to help achieve the conservation and management objectives for ABT fisheries.

**DATES:** Effective August 20, 1997. Restrictions on Honduras and Belize are applicable August 20, 1997; restrictions on Panama are applicable January 1, 1998.

**ADDRESSES:** Copies of the supporting documentation are available from Rebecca Lent, Chief, Highly Migratory Species Management Division, Office of Sustainable Fisheries (F/SF1), NMFS, 1315 East-West Highway, Silver Spring, MD 20910–3282.

**FOR FURTHER INFORMATION CONTACT:** Chris Rogers or Jill Stevenson, 301–713–2347.

**SUPPLEMENTARY INFORMATION:** The Atlantic tuna fisheries are managed under the authority of the Atlantic Tunas Convention Act (ATCA). Section 971d(c)(1) of the ATCA authorizes the Secretary of Commerce (Secretary) to issue regulations as may be necessary to carry out the recommendations of the

ICCAT. The authority to issue regulations has been delegated from the Secretary to the Assistant Administrator for Fisheries, NOAA (AA).

Background information about the need to implement trade restrictions and the related ICCAT recommendation was provided in the preamble to the proposed rule (62 FR 38246, July 17, 1997) and is not repeated here. These regulatory changes will further NMFS' management objectives for the Atlantic tuna fisheries.

**Proposed Import Restrictions**

In order to conserve and manage North Atlantic bluefin tuna, ICCAT adopted two recommendations at its 1996 meeting requiring its Contracting Parties to take the appropriate measures to prohibit the import of ABT and its products in any form from Belize, Honduras, and Panama. The first recommendation was that its Contracting Parties take appropriate steps to prohibit the import of ABT and its products in any form harvested by vessels of Belize and Honduras as soon as possible following the entry into force of the ICCAT recommendation. Accordingly, the prohibition with respect to these countries is effective August 20, 1997. The second recommendation was that the Contracting Parties take appropriate steps to prohibit such imports harvested by vessels of Panama effective January 1, 1998. This would allow Panama an opportunity to present documentary evidence to ICCAT, at its 1997 meeting or before, that Panama has brought its fishing practices for ABT into consistency with ICCAT conservation and management measures. Accordingly, the prohibition with respect to Panama will become effective January 1, 1998.

Under current regulations, all ABT shipments imported into the United States are required to be accompanied by a Bluefin Statistical Document (BSD). Under this final rule, United States Customs officials, using the BSD, will deny entry into the customs territory of the United States of shipments of ABT harvested by vessels of Panama, Honduras, and Belize and exported after the effective dates of the trade restrictions. Entry will not be denied for any shipment in transit prior to the effective date of trade restrictions.

Upon determination by ICCAT that Panama, Honduras, and/or Belize has brought its fishing practices into consistency with ICCAT conservation and management measures, NMFS will publish a final rule in the Federal Register that will remove import restrictions for the relevant party. In

Exhibit 3